## PETERSON v. WOOD et al.

No. 4564. Decided November 17, 1927. Rehearing Denied January 5, 1928. (262 P. 828.)

*Bagley, Judd & Ray*, of Salt Lake City, for appellant.

*P. C. Evans*, of Salt Lake City, for respondents.

THURMAN, C. J.

This is a controversy concerning the waters of a certain spring in Davis county, Utah. The spring is situated near the lower end of a small canyon sloping from the east towards the west. The canyon is about three miles long, and from a mile to a mile and a half in width at the widest part.

The defendants are the owners of the land from which the spring emerges to the surface, and the plaintiff is the owner of adjacent land on the north and west.

The spring in question has been in use, for beneficial purposes, by the defendants and their predecessors in interest ever since prior to the year 1880. In February, 1924, plaintiff purchased an additional 8 acres of land, a part of which is adjacent to and south of defendants' land upon which the spring is situated, and dug trenches therein for the purpose of developing water thereon for use upon the other land, to which we have referred. The point at which he dug his trenches was in the hollow of the canyon a distance of some 240 or 250 feet higher up the canyon than the outlet of defendants' spring and at an elevation above the level of said spring of about 50 feet. The water collected in the trenches dug by plaintiff amounted in quantity to about 24 gallons per minute and constituted a continuous stream. The topography of the country was such that he could not convey the water to the place of intended use without conveying it across defendant's land. He applied to them for a right of way for such purpose, but they refused his application, at the same time saying to him that he had no water and that the water he claimed belonged to them. This contention developed a situation bordering upon violence and finally resulted in plaintiff bringing this action, which is an action to quiet title and for injunctive relief. Defendants, by their answer and counterclaim, seek the same form of relief.

The pleadings are voluminous and contain many allegations that are wholly immaterial to a determination of the rights of the parties. For that reason we have not undertaken to make a detailed statement of the pleadings.

In addition to what has been said, it is sufficient to say that defendants claim to be the owners of all the waters of the spring, which is commonly known as the "Wood spring," and also insist that the waters claimed by plaintiff are a part of the waters of their spring as they flowed in an underground stream previous to the digging of the trenches. The plaintiff claims, first, that the waters collected by him in his trenches are percolating waters, and therefore belong

to him as owner of the land in which they are found, and, second, that the waters claimed by him are distinct and separate from the waters of the Wood spring and come from a different source. The trial court, upon these issues, found in favor of the defendants, and from the decree entered thereon plaintiff appeals.

The issues presented involve questions of both law and fact. It therefore becomes necessary to briefly review such portions of the evidence as are material to a determination of the questions involved, together with the principles of law applicable to the situation.

There is no conflict in the evidence as to the fact that George C. Wood, predecessor in interest of defendants, prior to the year 1880, when the land was part of the public domain, appropriated all the water of the Wood spring and commenced to use it for culinary, irrigation, and stock watering purposes. The spring is in the hollow of the canyon hereinbefore described and appears to be the main outlet for the precipitation falling on the surface within the canyon. A considerable area of surface surrounding the spring is covered with brush, trees, and other vegetation, indicating the presence of water near the surface. George C. Wood, subsequent to appropriating the water, dug a tunnel commencing at the outlet of the spring, thence up the hollow for a considerable distance, and then branched off in two directions, one towards the north and another towards the south, the entire system forming the shape of a Y. Ninety per cent of all the water flowing from the tunnels came from the south branch and issued from a space about 2 feet in width. The stream flowed with such force in the tunnels as to make considerable noise. It was stated by witnesses that the noise could be heard when the door was opened leading into the main tunnel. It does not satisfactorily appear, however, that any permanent increase was made in the flow of the water by digging the tunnels; nor was it to be expected unless new and distinct sources of water were encountered. That there was a temporary in-

crease was to be expected, and such fact finds some support in the evidence, A pipe line or lines were laid to convey the water to the place of use. A small reservoir was constructed, connected with the pipe line, to conserve the water. Several acres of ground were cultivated and profitable crops raised. Houses were built and the water used to supply them. The appropriation and use for all of such purposes have been continuous every year from the first appropriation, prior to 1880, down to the trial of the case. Furthermore, the quantity of water appropriated, when economically used, was not nearly sufficient to supply defendants and their predecessors in interest with the quantity of water they required for the purposes mentioned.

In February, 1924, appellant purchased or negotiated for 8 acres of land across the hollow in which the Wood spring and tunnels are situated and adjacent to defendants' land, and, as stated by appellant, the land was purchased for the purpose of developing water thereon. It was to be used by him upon other lands belonging to him in that vicinity. He constructed tunnels on the 8 acres upon a higher level, as before stated, and by means of such tunnels collected a considerable quantity of water. It was then that he tried to procure a right of way from the defendants across their lands. Defendants not only refused the right of way, but told him he had no water, that the water belonged to them, and requested him to let it alone. Considerable feeling was manifested. Defendants filled up appellant's trenches with dirt and debris, and no doubt made threats of what they would do if appellant attempted to use the water. Being unable to procure a right of way from defendants, the waters in the trenches had no place to go except down the hollow towards the outlet of the Wood spring. In doing so it caved in the tunnel of the spring some 30 or 40 feet above the outlet. While there is some conflict in the evidence as to whether the water from appellant's trenches, when mingled with the waters of the Wood spring, showed a greater quantity than flowed in the Wood spring, the great prepon-

derance of the evidence is to the effect that the quantity was not increased. Several witnesses who had been familiar .with the flow of the water for many years testified that the waters of the Wood spring, as they had known it prior to the digging of appellant's trenches, had not been increased when the waters were combined. As far as the testimony of lay witnesses is concerned, but one conclusion is fairly deducible, and that is that the original waters of the Wood spring have not been increased by the waters coming from the trenches dug by appellant. Furthermore, when the two streams were separately measured after the digging of the trenches, it was found that the quantity flowing in the Wood spring was less than the original quantity flowing, substantially to the extent of the quantity flowing in the trenches dug by appellant.

Several expert witnesses testified in the case, all of them in high standing in their respective professions.

Dr. Fred Pack, Professor of Geology in the University of Utah, a witness for the defendants was of opinion that the waters of the trenches dug by appellant were part of the waters that previously flowed from the Wood spring. Dr. Sterling Talmage, a geologist, at present teaching in the Northwestern University, and a witness for plaintiff, was of a contrary opinion, and expressed the belief that the waters of appellant's trenches were entirely distinct and separate from the source which supplied the Wood spring. Mr. Lloyd Garrison, state engineer for Utah in 1924, also testified for plaintiff, and was also of the same opinion as Dr. Talmage.

Each of these expert witnesses gave reasons for his opinion which were based largely upon undemonstrated theories relating to the character of the underground formation in the vicinity of the waters in question. It would be interesting, if space would permit and exigencies of the case demanded it, to discuss these theories at considerable length. There is only one feature of their testimony which we deem

it important to consider. It was agreed by all of them that the waters of the Wood spring flows from a gravel stratum superimposed upon an impervious stratum of clay, and that. the waters from appellant's trenches issued in the same manner from an underground stratum some 50 feet or more higher in elevation. There is also evidence to the effect that there are two or more alternate strata of gravel and clay between the clay stratum upon which the trenches water flowed and the stratum of clay upon which the Wood spring flowed. Dr. Pack, for the defendants, advanced what he called the "cascade theory," by which is meant that water seeping or flowing from a stratum situated upon a higher level will when it reaches the end of the stratum on a sloping surface, fall over the edge and sink till it reaches the next impervious stratum, and so on. So that, after all, the lower impervious stratum may be the recipient of water from higher strata before it finally emerges to the surface in the form of a spring. This theory was met by appellant's experts by showing that whenever water flowing or seeping upon an impervious stratum approaches near the point where it outcrops in the formation, there will be more or less vegetable growth and the ground will be moist, because the water is near the surface. It appears in the instant case that there is a heavy growth of vegetation, including trees of considerable size, both at the Wood spring and at appellant's trenches. But it also appears that between the Wood spring and appellant's trenches there is no such growth of vegetation. From these phenomena appellant's witnesses conclude that Dr. Pack's cascade theory, however plausible in a proper case, has no application in the case at bar. Their contention is that if the water cascaded from one impervious stratum to another in the instant case there would be patches of vegetable growth at or near the outcropping of every impervious stratum, unless there is a break in the stratum, of which, it is contended, there is no evidence. In this connection, to illustrate appellant's contention, we quote the following from his counsel's brief:

"In order for the water from the Peterson ground to form a sub-terranean 'cascade' over the edge of the clay member it would be nec-essary for the water to percolate horizontally through the clay a distance of some 30 feet as shown on Plaintiff's Exhibit 3. Inas-much as Dr. Talmage testified that water did not flow from an open ditch through this stratum for a distance of from 1 to 2 feet in nearly 2 years, and this testimony stands uncontradicted, the prob-ability of water 'cascading' through 30 feet of such ground before falling over the edge and maintaining a speed sufficient to feed the Wood tunnel is seen to be rather remote."

If there are 30 feet of clay between the trenches of ap-pellant and the clay stratum upon which the Wood spring flows, or even half that depth, and it takes so long for water to seep through 1 or 2 feet, it is difficult to understand how a small stream of only 24 gal-lons per minute sinking into the ground above the clay-cap-ped roof of the Wood tunnel would cause it to collapse and cave in within a short time after the trenches were dug and the water turned down. However, it is more the province of expert witnesses to speculate and theorize upon prob-abilities and improbabilities pertaining to questions of this kind than it is for the court. It is sufficient to say that if there is no evidence concerning whether or not there was a break in the clay stratum or strata, whichever it is, be-tween the clay stratum at appellant's trenches and that at the Wood spring, it is not a matter of which appellant can take advantage in this kind of a case. The rule is well settled in this jurisdiction that whoever claims he has de-veloped water in close proximity to the source of a stream, previously appropriated by others, is charged with the burden of proving that his alleged development of water does not interfere wath the waters theretofore appropriated. *Mountain Lake Mining Co.* v. *Midway Irr. Co.,* 47 Utah 346, 149 P. 929; *Bastian* v. *Nebeker,* 49 Utah 390, 163 P. 1092; *Snake Creek Mining & Tunnel Co.* v. *Midway Irriga-tion Co.,* 260 U. S. 596, 43 S. Ct. 215, 67 L. Ed. 423. There-fore, we hold that as to whether or not there was a break

in the clay stratum or strata between the clay stratum of appellant's trenches and the clay stratum of the Wood tunnel, it was a question as to which the appellant had the burden of proof.

We are clearly of the opinion that the identity of the waters of appellant's trenches with those of the Wood spring as they flowed previous to the digging of the trenches by appellant was clearly established by a preponderance of the evidence. Furthermore, we are equally of opinion that there has been no permanent increase in the flow of water in the Wood spring since its first appropriation by defendants' predecessor in interest, prior to 1880, when the land from which the spring issued was government domain.

We come now to a brief consideration of the law applicable to the case.

Appellant has cited all of the cases to which we need refer, and many more. They have been cited promiscuously, however, without serious attempt at definite application to the case at bar.

In our conclusions from the evidence we have found that George C. Wood, predecessor of defendants, appropriated the waters of the Wood spring prior to 1880, when the land was government domain, and that he and successors in interest have used it for beneficial purposes ever since that time. We have found that there has been no permanent increase in the waters of the spring since that time. We have found that the water developed by appellant's trenches is a part of the flow of the Wood spring, as it flowed before the trenches were dug, and notwithstanding the trial court found that the Wood spring was formed by an underground stream, as distinguished from water percolating in the land, we have not found upon that question, although the trial court's finding is well supported by substantial evidence. We are of opinion, under the facts of this case, such distinction is wholly immaterial.

If the water was appropriated by defendants' predecessor prior to 1880, when the land was government domain, as we have found, it matters not whether it was water percolating in the land or flowing through the land in subterranean streams. *Sullivan* v. *Mining Co.*, 11 Utah 438, 40 P. 709, 30 L. R. A. 186. The Sullivan Case is squarely in point. It has never been overruled or modified, except that the last sentence but one in the opinion, at p. 444 (40 P. 709), has been frequently declared to be dictum, and not, in any logical sense, a modification of the opinion as to the question decided. *Stookey* v. *Green*, 53 Utah 311, 178 P. 586, reviews the Sullivan Case, at p. 317 (178 P. 586). It was also reviewed in *Snake Creek Min. & Tunnel* Case, supra, at pp. 602, 603 (43 S. Ct. 215). Both of these cases are Utah cases, and in each of them the sentence referred to in the Sullivan Case is declared to be dictum, and, consequently, without force as authority. In the Sullivan Case the court, at p. 441 (40 P. 709), tersely states the question to be decided as follows:

"The main question in this case, and the only one, in fact, which we deem it necessary to consider is, Can the discoverer of a flow of percolating waters on the public lands, by digging wells and improving the same and constantly using the water for a beneficial purpose, acquire a right to take water from such wells as against an owner of the land on which the well is located, where the owner of the land acquired title by a location made subsequent to the digging of the wells?"

After referring to some authorities and stating the facts the court, at p. 442 (40 P. 710 (40 P. 710), proceeds to state the grounds upon which it rests its decision. It refers to the act of Congress of 1866 (U. S. Rev. Stats. § 2339 [30 USCA § 51]) which grants the right to appropriate water on the public domain. The court also refers to the act of Congress of 1870 (Rev. Stats. § 2340 [30 USCA § 52]) providing that patents for land theretofore issued should be subject to rights acquired under the preceding section. These sections are quoted at length in the Sullivan

opinion. The court then refers to the Utah statute then in force (Comp. Laws 1888, § 2780) defining a vested right by appropriation, and quotes the following passage:

"First, whenever any person or persons shall have taken, diverted and used any of the unappropriated water of any natural stream, water course, lake, or spring, or other natural source of supply."

Upon these sections of the United States statutes and the statute of Utah the court based its decision and decided that Sullivan was entitled to the water, as against the owner of the land, because he had dug his well and commenced to use the water while the land was public domain. It will be observed that none of the statutes exclude the right to appropriate percolating water. No distinction in that respect appears in any of the statutes referred to. The water in question in the Sullivan Case was unquestionably percolating water, as distinguished from water flowing in a subterranean stream.

The Snake Creek Tunnel Case, supra, was also a case of percolating water. The Midway Irrigation Company, defendant in that case, and its predecessors in interest had for a period of more than 40 years previous to the trial, when the land was public domain, appropriated all of the waters of Snake Creek and put them to a beneficial use. After the appropriation was made the plaintiff, a mining and tunnel company, procured patents to certain mining claims situated above the lands of the defendants and along the course of the creek. The mining company constructed a tunnel extending into the bosom of the mountain and in the direction of the headwaters of the creek. Large quantities of water were encountered which the mining company claimed to be percolating waters, and upon that ground claimed to be the owner thereof. The defendants insisted that the tunnel cut the underground sources that fed the creek and that it interfered with their prior appropriation. Consequently they claimed the water which was flowing from the portal of the tunnel back into the creek. Upon

that assertion of claim the mining company instituted an action in the United States District Court (Utah) to quiet its title to the water. That court decided the case in favor of the mining company. On appeal to the United States Circuit Court of Appeals, the judgment was reversed and judgment entered for defendants, quieting their title. The case then went to the Supreme Court of the United States, on certiorari, and the judgment of the Circuit Court of Appeals was affirmed.

The Sullivan Case and the Snake Creek Tunnel Case are exactly in point on the question presented here, and the logic of these cases can hardly be successfully challenged.

Appellant's counsel cite many other Utah cases in his brief and so distinguishes them himself as to show that they have no application to the instant case. Indeed, the cases distinguish themselves, and we cite them here without further comment for the benefit of those whom it may concern. *Fayter* v. *North* 30 Utah 156, 83 P. 742, 6 L. R. A. (N. S.) 410; *Garns* v. *Rollins*, 41 Utah 260, 125 P. 867, Ann. Cas. 1915C, 1159; *Roberts* v. *Gribble*, 43 Utah 411, 134 P. 1014; *Rasmussen* v. *Moroni Irrigation Co.*, 56 Utah 140, 189 P. 572; *Peterson* v. *Lund*, 57 Utah 162, 193 P. 1087; *Horne* v. *Utah Oil Ref. Co.*, 59 Utah 279, 202 P. 815, 31 A. L. R. 883; *Glover* v. *Utah Oil Ref. Co.*, 62 Utah 174, 218 P. 955, 31 A. L. R. 900; *Herriman Irr. Co.* v. *Keel*, 25 Utah 96, 69 P. 719; *Crescent Min. Co.* v. *Silver King Min. Co.*, 17 Utah 444, 54 P. 244, 70 Am. St. Rep. 810; *Willow Creek Irr. Co.* v. *Michaelson*, 21 Utah 248, 60 P. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687; *Peterson* v. *Eureka Hill Min. Co.*, 53 Utah 70, 176 P. 729; *Stookey* v. *Green*, 53 Utah 311, 178 P. 568; *Deseret Live Stock Co.* v. *Hooppiania*, 66 Utah 25, 239 P. 479.

None of these cases last cited involve the question of the right of a prior appropriator of water on the public domain as against the right of a subsequent patentee of the land. In that respect the Sullivan and Snake Creek Tunnel Cases stand alone, and therefore are the only cases applicable

to the question presented here. There is, however, an academic discussion of the question in the Stookey-Green case, cited by appellant, the logic of which is to the same effect.

Some point is made by appellant's counsel concerning the Hooppiania Case, supra, and he quotes from the opinion the following passage:

"We do not find any conclusive evidence in the record as to whether or not the lands upon which these springs are located were part of the public domain at the time of the attempted appropriation. The waters from the springs in controversy were not sufficient in volume to run into or create a natural channel, and were not sufficient in volume to run to appellant's land, and would not reach appellant's land without being fed by water from other sources. The waters of the springs are therefore precolating waters, and if such springs are located upon private lands the waters arising therefrom are not subject to appropriation."

The passage quoted by appellant clearly shows that the writer of that opinion had in mind the rule announced in the Sullivan, Snake Creek Tunnel, and Stookey-Green Cases, to the effect that if the appropriation was made on the public domain it would prevail as against a subsequent patentee of the land and his successors in interest. And it makes no difference whether the water is percolating water or is water flowing in a subterranean stream. As applied to the facts of that case, we have no fault to find with the language quoted, but its application should be so limited.

In view of the fact that the trial court found that the Wood spring was formed by an underground stream, and that there is substantial evidence to support the finding, it was perhaps unnecessary to extend our remarks to the extent we have concerning the present state of our law as to percolating waters. But counsel for appellant vigorously assailed the finding referred to as being unsupported by the evidence. In order to meet that contention we deemed it pertinent to show, under the evidence disclosed by the record here, that it is wholly immaterial whether the water of the Wood spring is percolating water, as that term is

known at the common law, or whether it is the water of a subterranean stream. We believe that the cases to which we have referred have settled that question once and for all in cases of this nature, and settled it right.

We find no error in the record, and the judgment of the trial court is affirmed at appellant's costs.

CHERRY, STRAUP, HANSEN, and GIDEON, JJ., concur.